UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| AssuredPartners of South Carolina, LLC, and AssuredPartners Capital, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>Alliant Insurance Services, Inc., Richard H. Lonneman, Jr., Meghan Schultz, Amanda Peterson, Melissa A. Bugeski, and Laurence Rushe,<br><br>Defendants. | C.A. NO.     3:23-4751-TLW |

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs AssuredPartners of South Carolina, LLC, ("AP") and AssuredPartners Capital, Inc. ("AP Cap") (collectively, "Plaintiffs") file the following Verified Complaint for Damages and Injunctive Relief against Defendants Alliant Insurance Services, Inc. ("Alliant"), Richard H. Lonneman, Jr. ("Lonneman"), Meghan Schultz ("Schultz"), Amanda Peterson ("Peterson"), Melissa A. Bugeski ("Bugeski"), and Laurence Rushe ("Rushe") (Lonneman, Schultz, Peterson, Bugeski and Rushe are collectively referred to as "Individual Defendants")(Individual Defendants and Alliant are collectively referred to as "Defendants").

**I.     INTRODUCTION**

1.     If Alliant had a company slogan, it would be, "why earn it when you can steal it?" Alliant prides itself on this unsavory business model. Its theory is that it is cheaper to defend and settle a lawsuit than it is to legitimately buy business on the open market or itself generate organic sales. To execute on this model, Alliant raids teams of employees from its competitors and has its

outside counsel obtain confidential and trade secret information from said employees, all the while coaching them that it is crucial they steal as much business from their prior employers as possible within 72 hours of their resignation, irrespective of how flagrantly these employees may violate their post-employment restrictive covenants and/or employer related obligations (because the attorneys will "work it out.").[1]

2.      The tight window to steal business is impressed upon the newly-raided employees as a means to get around the injunctive relief that is sure to be pursued in these matters. From Alliant's view, even if a court enters an injunction in the competitor's favor, the raid is a "win" because by the time an order is entered, Alliant has already blitzed the business and moved much of the targeted annual revenue – usually the largest and most profitable accounts - to its pockets.[2]

3.      The cost Alliant incurs in the lawsuit pales in comparison to the multi-year revenue stream Alliant has clandestinely secured by pirating the competitor's employees and clients. Indeed, there are dozens of lawsuits around the country against Alliant for this exact conduct against top competitors in the insurance industry, including but not limited to Arthur J. Gallagher & Co., AON PLC, Armfield, Harrison & Thomas, LLC, USI Insurance Services, LLC, Willis Towers Watson Southeast, Inc., Mountain West Series of Lockton Cos., LLC, and several AssuredPartners' entities as well.[3]

---

[1] *See* Affidavit of Michael Harrington filed simultaneously herewith as **Exhibit 1,** wherein he describes his experience with Alliant and its representatives in connection with Alliant's efforts to recruit him from Regions Insurance division to Alliant.

[2] Plaintiff reserves its right to, and is actively considering, suing Alliant's outside counsel if discovery demonstrates conduct similar to that set forth in Mr. Harrington's Affidavit and if they likewise directly participated in Alliant's well-known scheme, as there is no privilege between Alliant's attorneys and prospective Alliant employees.

[3] A list of the numerous lawsuits AssuredPartners has located in which Alliant has been a defendant is attached hereto as **Exhibit 2**.

4.     Plaintiffs are simply Alliant's latest target.  On September 19, 2023, five of Plaintiffs' employees resigned one after the other, effective the same day (*i.e.*, with no notice) and immediately moved to Alliant, updating their LinkedIn profile to reflect their sudden move within a few short hours.  Zoom records indicate that even before the Individual Defendants left, they began scheduling meetings with the highest-grossing revenue clients the Individual Defendants serviced on behalf of Plaintiff, likely to notify the clients of their impending departure and to discuss whether the client would follow them to Alliant.[4]

5.     Then, on the exact same day of their resignations, the Individual Defendants had another Alliant producer (Peter Johnson, an Alliant agriculture producer that Plaintiffs' clients had never met or even heard of) start calling Plaintiffs' clients to indirectly solicit their business on the Individual Defendants' behalf.  The Alliant producer, Mr. Johnson, also doubtlessly obtained the contact information for Plaintiffs' clients from one or more of the Individual Defendants.

6.     When the indirect solicitations did not immediately pan out in the first 24 hours, the Individual Defendants themselves started calling Plaintiffs' clients to solicit their business.[5]  Both Schultz and Peterson have contacted different clients of Plaintiffs.  Additionally, before the Individual Defendants resigned, at least three of the five Individual Defendants deleted their entire AssuredPartners email inboxes, likely to impair Plaintiffs' ability jump right into service the very clients at issue and to cover-up their wrongful conduct.

7.     Unless immediately enjoined by this Court, Defendants will violate with impunity their restrictive covenants and legal obligations, causing Plaintiffs irreparable harm to their

---

[4] *See* Declaration of Jon Taylor filed simultaneously herewith as **Exhibit 3**.
[5] *See id.* (During Zoom call, clients informed Mr. Taylor that Alliant producer called multiple times and also received direct call from Schultz while on the phone with Mr. Taylor).

goodwill, client relationships, confidential and trade secret information, and skilled and trained workforce.

## II. PARTIES, JURISDICTION AND VENUE

8. Plaintiffs are insurance brokerage firms that sell a wide variety of insurance services and products. AP is a South Carolina limited liability company. AP maintains an office in and conducts business in Columbia, South Carolina. AP's sole member is AssuredPartners NL, LLC. AssuredPartners NL, LLC's sole member is AssuredPartners Capital, Inc., which is a Delaware corporation with its principal place of business located in Florida. AP Cap is AP's ultimate parent company and, as such, owns and has an interest in all operations and assets associated with AP.

9. Lonneman was an equity owner and employee of Plaintiffs (and its predecessor) from approximately 2004 until his abrupt resignation, without any notice, early on the morning of September 19, 2023. Lonneman lives in Ohio, but performed substantial work for Plaintiffs in South Carolina, including making trips to South Carolina for work reasons; supervising a team of employees in South Carolina (three of whom resigned at the same time as Lonneman); managing a large book of business of Plaintiffs' clients, many of which are located in South Carolina; receiving confidential information about Plaintiffs' clients in South Carolina; and soliciting and servicing clients for Plaintiffs in South Carolina. Peterson also lives in Ohio. Plaintiffs provided Lonneman and Peterson a satellite office to work from in Ohio. Peterson, while working from Ohio, assisted Lonneman with servicing the aforementioned clients, including the clients located in South Carolina and Peterson regularly communicated via text, phone and email with Plaintiffs' South Carolina clients and employees. Lonneman and Peterman are now working for Alliant to

compete with Plaintiffs in South Carolina and steal Plaintiffs' South Carolina clients, among others.

10. Schultz, Bugeski and Rushe all currently reside in South Carolina.

11. During Lonneman's tenure, he worked closely with his team of Plaintiffs' employees, which included Schultz, Peterson, Bugeski, and Rushe. Schultz, Peterson, Bugeski and Rushe were all Plaintiffs' employees until September 19, 2023, when they also abruptly resigned, without notice, using similar resignation language to Lonneman. That same day, they immediately started working for Alliant and almost doubtless are now using Plaintiffs' confidential and trade secret information to attempt to quickly steal Plaintiffs' clients.

12. Indeed, as discussed in Jon Taylor's Declaration attached hereto as **Exhibit 3**, Alliant (clearly using Plaintiffs' confidential client contact information) and at least one of the Individual Defendants have already begun soliciting Plaintiffs' clients. Moreover, it appears that the Individual Defendants scheduled meetings with several of two of the highest-grossing revenue clients they serviced even before their resignations to notify the clients of their impending departures. *Id*.

13. Alliant is a direct competitor of Plaintiffs. Alliant is a California corporation with its principal place of business in California. Alliant maintains an office in and conducts business in Columbia, South Carolina and its tortious conduct, as described herein, occurred at least in part in Columbia, South Carolina.

14. Defendants are subject to the jurisdiction of this Court.

15. This Court possesses diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and 28 U.S.C. §1367. For the purposes of diversity jurisdiction, AP and AP Cap are considered a resident of Delaware and Florida. The citizenship of a limited liability company is

determined by the citizenship of all of its members and not its state of formation and principal place of business. Alliant is considered a citizen of California, Lonneman and Peterson are citizens of Ohio, and Schultz, Bugeski and Rushe are residents of South Carolina. Therefore, this controversy is between citizens of different states.

16.  The clients the Individual Defendants solicited, sold products and services to, and serviced during their employment with Plaintiffs resulted in annual revenue to Plaintiffs in excess of $8,000,000.00 (a significant portion of which is made up of accounts previously gifted by Plaintiffs to Lonneman) resulting in payments to Lonneman in excess of $2,200,000 in income last year and payments over $2,700,000 to the Individual Defendants combined last year. The Defendants are attempting to steal as much of this business from Plaintiffs as possible. Accordingly, this controversy exceeds the sum or value of $75,000.00 (exclusive of interest and costs).

### III.    FACTS

17.  Lonneman became an employee of Plaintiffs as part of AP Cap's acquisition of an insurance agency in which Lonneman was employed. As part of this transaction and his new employment, Lonneman agreed to sign a Restrictive Covenants Agreement (the "RCA")[6]. The RCA contains industry-standard and narrowly tailored restrictive covenants.

18.  In the RCA, Lonneman promised to comply with reasonable restrictions related to the retention, use and disclosure of Plaintiffs' Confidential information, including that he would maintain in confidence and not disclose any Confidential Information relating to Plaintiffs'

---

[6] A true and accurate copy of the RCA signed by Lonneman is attached to this Complaint as **Exhibit 4**. Some of the allegations in this Complaint summarize the restrictions in the RCA and in no way limit the more fully defined terms, restrictions and definitions in the RCA.

business, and that he would return all of Plaintiffs' Confidential Information upon the termination of the employment relationship:

> 3. **Confidential Information.**
>
>    3.1. For purposes of this Agreement, the term "Confidential Information" means all confidential, proprietary and/or non-public information, whether or not in a written or recorded form, concerning the business or affairs of the Company, including but not limited to, information concerning:
>
>       3.1.1. the Company's clients, prospective clients, acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements (including special terms and deals);
>
>       3.1.2. the Company's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods; and
>
>       3.1.3. the services and products offered by the Company to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks.
>
>    3.2. Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of the Company. Accordingly, both during and after employment with the Company (whether such separation from employment is voluntary or involuntary, or with or without cause), Employee shall not use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of Employee's employment or as approved by an executive officer of the Company in writing. Upon separation of employment for any reason, or at any other time upon request of the Company, Employee shall immediately deliver to Employer all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of the Company.

19.     In the RCA, Lonneman also promised to comply with certain post-employment obligations related to the non-solicitation of, non-servicing of, and non-interference with Plaintiffs' Restricted Clients and employees, either directly or indirectly through another person or entity:

> 4.1. Except on behalf of the Company, during Employee's employment with the Company and for twenty-four (24) months after Employee's employment ends with the Company (whether voluntary or involuntary or with or without cause), Employee shall not directly or indirectly through another person or entity:
>
>> 4.1.1. offer, sell, solicit, quote, place, provide, renew or service any insurance product or service to, or on behalf of, any Restricted Client;
>>
>> 4.1.2. take any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client, other client of the Company, or any other third party with a material business relationship with the Company to cease or refrain from doing business with the Company; or
>>
>> 4.1.3. solicit, hire, engage or seek to induce any of the Company's employees to terminate such employee's employment with the Company for any reason, including, without limitation, to work for Employee or a competitor of the Company.

20. The RCA narrowly defines "Restricted Client" as follows:

> 4.2. *Restricted Clients.* For purposes of this Agreement, "Restricted Client" means the following:
>
>> 4.2.1. any client of the Company at the office where Employee was employed during the two (2) years immediately preceding the date on which Employee's employment with the Company ended for any reason, whether voluntary or involuntary or with or without cause (the "Separation Date");
>>
>> 4.2.2. any client of the Company during the two (2) years immediately preceding the Separation Date as to which the Employee either had some involvement in proposing, selling, quoting, placing, providing, servicing or renewing any insurance product or service or about whom the Employee received Confidential Information; or
>>
>> 4.2.3. any prospective client of the Company within two (2) years immediately preceding the Separation Date as to which Employee had involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom Employee received Confidential Information.

21. Throughout his employment with Plaintiffs, Lonneman had substantial contact with Plaintiffs' clients, prospective clients and employees, and he had access to Plaintiffs' trade secret and Confidential Information.

22. Plaintiffs' employed Defendants Schultz, Peterson (in Ohio), Bugeski, and Rushe in its Columbia, South Carolina office where they worked as either account managers or account coordinators servicing Plaintiffs' clients. In said roles, Defendants' Schultz, Peterson, Bugeski

Page **8** of **20**

and Rushe worked closely with Plaintiffs' clients on a daily basis and had access to Plaintiffs' Confidential Information and trade secrets. At the initiation of their employment, Schultz, Peterson, Bugeski and Rushe each signed RCAs that are very similar to Lonneman's RCA in that they (a) restrict the retention and use of Plaintiffs' Confidential Information, (b) restrict the solicitation of, servicing of and interference with (among other things) Plaintiffs' clients as to which: (i) they received any commission, bonus, fee or any other compensation; (ii) had material involvement in proposing, selling, quoting, placing, providing, referring, servicing or renewing Insurance Products or Related Services (defined terms); or (iii) about which Employee received Confidential Information; and (c) restricts the solicitation, encouragement or inducement of Plaintiffs' employees to leave Plaintiffs and become employed by a competitor.[7]

23.     At all times material hereto, Alliant knew that all of the Individual Defendants signed RCAs with Plaintiffs and worked as a single team when it solicited, recruited, and encouraged the Individual Defendants to resign their employment with Plaintiffs' (in unison and without notice, no less), and then immediately hired them.

24.     Each of the Individual Defendants knew that the others signed RCAs when they collectively solicited, influenced and encouraged each other to resign from Plaintiffs on the same day (early morning on September 19, 2023), using nearly the same resignation email, and then immediately started working for Alliant. True and correct copies of the Individual Defendants' resignation communications are attached hereto as **Composite Exhibit 9**.

25.     Plaintiffs are investigating whether the Individual Defendants copied or removed Plaintiffs' Confidential Information from Plaintiffs' offices, devices and/or accounts. However, it

---

[7] The RCAs of Defendants Schultz, Peterson, Bugeski and Rushe are attached as **Exhibits 5, 6, 7, and 8** respectively. The references above are summaries of the restrictions in these RCAs and in no way limit the more fully defined terms, restrictions and definitions in the RCAs

is important to note that, before the Individual Defendants resigned, at least three of the five Individual Defendants deleted their entire AssuredPartners email inboxes, likely to impair Plaintiffs' ability to discover their wrongful conduct.

26. As discussed in Mr. Taylor's Declaration (**Exhibit 3** hereto), Plaintiff discovered that, the day before the Individual Defendants resigned (September 18, 2023), several of the Individual Defendants scheduled calls with several of Plaintiffs' highest grossing revenue clients and almost doubtlessly informed these clients of their move to Alliant. Plaintiffs also discovered that, not only had another representative of Alliant (Peter Johnson – a producer the clients have never met or heard of) reached out to several of Plaintiffs' clients the day of and the day after the Individual Defendants' resignations, but that Ms. Schultz and Ms. Peterson themselves were contacting Plaintiffs' clients on September 20, 2023 and September 21, 2023, the days after their resignations.

27. This is not the first time Plaintiffs (or Plaintiffs' related entities) have been a victim of Alliant's misconduct. In *AssuredPartners of Washington, LLC v. Acarregui et al.*, docket no. 2:220-cv-00290 (W.D. Wash., Feb. 24, 2020), Plaintiffs sued Alliant in Washington D.C. federal court for raiding its employees and inducing them to violate their RCAs by stealing Confidential Information, soliciting other employees, and stealing Plaintiffs' clients. Plaintiffs (or Plaintiffs' related entities) made similar allegations against Alliant in *AssuredPartners Northeast, LLC v. Stone et. al.*, Docket No. 2:20-cv-05564 (E.D.N.Y. Nov 16, 2020). AssuredPartners obtained injunctive relief against Alliant in both cases.

28. Simply put, Alliant has not learned its lesson and it continues engage in illegal and ethically bankrupt business practices, even in the face of numerous adverse rulings against it.

Alliant has decided that stealing business is a better and less expensive way of doing business than obtaining business lawfully and encouraging compliance with valid contractual obligations.

29. Plaintiffs seek the assistance of this Court to immediately stop Alliant and the Individual Defendants in their tracks, prevent these unfair practices, prevent the disclosure and use of Plaintiffs' Confidential Information and trade secrets, stop the solicitation of and interference with Plaintiffs' clients, and to issue severe remedies that will make Alliant think twice in the future before using these unlawful and unfair business practices.

30. Defendants' conduct has resulted in and will continue to result in significant irreparable harm and lost business to Plaintiffs. *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985) (the possibility of permanent loss of customers to a competitor or possible loss of good will satisfies the irreparable harm prong of the *Blackwelder* standard in a case where a broker, subject to non-compete and non-solicitation clauses, changed brokerage firms.); *Allied Universal Corp. v. Given*, 223 So. 3d 1040, 1044 (Fla. 3d DCA 2017) (breaching agent's use and disclosure of things like confidential information, customer information, relationships, and/or marketing strategies in his or his new employment/relationship with a new competing company is sufficient to demonstrate irreparable injury). Accordingly, Plaintiffs seek the assistance of this Court in remedying these legal violations.

### IV. CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**
**(Against The Individual Defendants)**

31. Plaintiffs re-allege the allegations paragraphs 1 through 30 above as if they are fully set forth herein.

32. The Individual Defendants' RCAs are supported by valuable consideration, including initial and continued employment as well as access to Plaintiffs' trade secrets and Confidential Information.

33. The restrictions in the Individual Defendants' RCAs are reasonable in duration and scope, and are narrowly tailored and reasonably necessary to protect Plaintiffs' legitimate business interests, which business interests include Plaintiffs' Confidential Information, substantial relationships with Plaintiffs' existing and prospective clients, goodwill in the relevant market area, skilled and trained workforce, and referral source relationships.

34. The Individual Defendant have violated the RCAs by retaining, misappropriating, using, and/or disclosing Plaintiffs' trade secret and Confidential Information in connection with their work for Alliant, to Plaintiffs' detriment. (*See* **Exhibit 4**, **¶ 3, Exhibit 5, ¶ 2, Exhibit 6, ¶ 2, Exhibit 7, ¶ 2, and Exhibit 8, ¶ 2**).

35. The Individual Defendants have breached the RCAs by engaging in conduct that, unless enjoined, will result in the loss of Plaintiffs' Restricted Clients to Alliant, including the solicitation of, servicing of, and interference with Plaintiffs Restricted Clients on Alliant's behalf. (*See* **Exhibit 4, ¶ 4, Exhibit 5, ¶ 3, Exhibit 6, ¶ 3, Exhibit 7, ¶ 3, and Exhibit 8, ¶ 3**).

36. The Individual Defendants breached the RCAs by encouraging Plaintiffs' Restricted Clients to cease or refrain from doing business with Plaintiffs in favor of Alliant. (*See* **Exhibit 4, ¶ 4, Exhibit 5, ¶ 3, Exhibit 6, ¶ 3, Exhibit 7, ¶ 3, and Exhibit 8, ¶ 3**).

37. The Individual Defendants breached the RCAs by: (a) consulting with each other about resigning their employment with Plaintiffs and going to work for Alliant; (b) recruiting and soliciting each other to work for a competitor; (c) coordinating their departures so that they all resigned on the morning of September 19, 2023; and/or (d) conspiring to immediately start

working for Alliant and to move as much of Plaintiffs' business as possible, as quickly as possible, before Plaintiffs could take action to stop them. (*See* **Exhibit 4, ¶ 4, Exhibit 5, ¶ 3, Exhibit 6, ¶ 3, Exhibit 7, ¶ 3, and Exhibit 8, ¶ 3**).

38. All of the Individual Defendants' conduct described above has occurred within the restricted time period in the RCAs, which applied during their employment with Plaintiffs and for a period of two years thereafter.

39. As a direct and proximate result of their actions, the Individual Defendants caused and will continue to cause Plaintiffs to suffer irreparable injury if they are not restrained.

40. Plaintiffs do not have an adequate remedy at law and an injunction is necessary to stop the Individual Defendants from further violating their respective RCAs.

41. Public interest supports the entry of injunctive relief.

42. Plaintiffs are entitled to a temporary restraining order and a preliminary injunction prohibiting the Individual Defendants' ongoing breaches of their RCAs and indeed the Individual Defendants even agree that such relief is appropriate in the RCAs.

43. Plaintiffs are entitled to an order tolling the restrictions in the RCAs based on the period of the Individual Defendants' violations.

44. By reason of the foregoing, to the extent some damages may be able to be calculated, the Individual Defendants are also liable to Plaintiffs for actual and consequential damages in an amount to be determined at trial.

45. Because of these breaches of contract, Plaintiffs have been required to retain counsel to prosecute its claims. Plaintiffs have agreed to pay their counsel for the reasonable attorneys' fees and expenses incurred on Plaintiffs' behalf in this lawsuit. Pursuant to the specific terms in each of the Individual Defendants' RCAs, as well as Florida's restrictive covenant statute,

section 542.335, *Florida Statutes*, Plaintiffs are entitled to recover its reasonable and/or necessary attorneys' fees and costs incurred in the prosecution of this lawsuit.

46.     The Individual Defendants and Plaintiffs have agreed to waive any right to a trial by jury related to the claims in this action. (*See* **Exhibit 4, ¶ 21, Exhibit 5, ¶ 21, Exhibit 6, ¶ 21 Exhibit 7, ¶ 23, and Exhibit 8, ¶ 23**).

**SECOND CAUSE OF ACTION**
**(Tortious Interference with Contractual and Prospective Contractual Relations)**
**(Against All Defendants)**

47.     Plaintiffs re-allege the allegations paragraphs 1 through 46 above as if they are fully set forth herein.

48.     The Individual Defendants have improperly diverted business opportunities away from Plaintiffs, have interfered with Plaintiffs' relationships with their employees and Restricted Clients, and have solicited Restricted Clients to not conduct business with Plaintiffs and instead move their business to Alliant.

49.     The Individual Defendants were aware of Plaintiffs' contracts and prospective contracts with its Restricted Clients and have induced and intend to intentionally induce the breach of these contracts and prospective contracts.

50.     The Individual Defendants were aware of Plaintiffs' contracts with its employees and has procured and induced the breach of these contracts.

51.     Alliant was aware of Plaintiffs' contracts with the Individual Defendants and was aware that the contracts contained restrictive covenants. Despite this knowledge, Alliant hired the Individual Defendants and encouraged the Individual Defendants to breach their contracts with Plaintiffs as described herein. Alliant knowingly interfered with Plaintiffs' contracts with the Individual Defendants, caused and contributed to the Individual Defendants' breaches of their

contracts, benefited from the Individual Defendants' breaches, and will continue to benefit from these breaches without immediate action by this Court.

52. Because of Defendants' wrongful acts, Plaintiffs have lost and will lose: (a) business opportunities; (b) the value of their trade secret and Confidential Information; (c) clients, prospective clients and employee relationships; (d) their skilled and trained workforce; and (e) Plaintiffs' client and market goodwill.

53. Defendants' actions have caused, and will continue to cause, immediate and irreparable harm to Plaintiffs.

54. Plaintiffs have no adequate remedy at law.

55. Plaintiffs are entitled to a temporary restraining order, preliminary injunctive relief, actual damages, compensatory damages, and punitive damages against all of the Defendants.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against All Defendants)**

56. Plaintiffs re-allege the allegations paragraphs 1 through 55 above as if they are fully set forth herein.

57. Defendants' improper conduct as alleged above has and will continue to enable Defendants to compete unfairly with Plaintiffs.

58. Defendants' conduct was wrongful and performed in a malicious manner to harm Plaintiffs and to unjustly enrich Defendants at Plaintiffs' expense.

59. Defendants, through their wrongful conduct as described herein, have unjustly enriched themselves at Plaintiffs' expense.

60. The circumstances are such that it would be unfair to allow Defendants to retain the value of the benefit they have conferred upon themselves at Plaintiffs' expense.

61. As a direct and proximate cause of Defendants' improper conduct, Defendants have been unjustly enriched in an amount to be determined at trial, and Plaintiffs are entitled to the recovery and disgorgement of any and all profits, earnings, and commissions attributable to Defendants' wrongful actions.

**FOURTH CAUSE OF ACTION**
**(Violation of the South Carolina Unfair Trade Practices Act)**
**(Against All Defendants)**

62. Plaintiffs re-allege the allegations paragraphs 1 through 61 above as if they are fully set forth herein.

63. Defendants have committed and are continuing to commit unfair or deceptive trade practices in violation of S.C. Code Ann. § 39-5-10 to -160, commonly known as the "Unfair Trade Practices Act" ("UTPA").

64. Defendants will continue to use improper methods, including those identified above, to interfere with Plaintiffs' business relationships, to harm Plaintiffs, and to benefit Defendants.

65. Alliant has actively targeted Plaintiffs' Restricted Clients, confidential information and trade secrets, and Plaintiffs' key employees. Alliant hired five of Plaintiffs' employees that collectively serviced $8,000,000 worth of accounts, directed them to simultaneously resign without notice, commence working with Alliant that same day, and move as many of Plaintiffs' clients as possible to Alliant within 72 hours of their departure. Alliant's targeting of Plaintiffs' employees, information, and clients in this manner constitutes an unfair business practice.

66. Defendants' activities have occurred in pursuit of interstate business activity and are therefore in the "stream of commerce" as defined by South Carolina law.

67. Defendants' actions have affected commerce in that they adversely and substantially affect business activity.

68. Defendants' actions have an adverse impact on the public interest. This is not the first time Alliant has engaged in this type of conduct toward Plaintiffs (or Plaintiffs' related entities) and is certainly not the first time it has engaged in this type of unlawful conduct within the insurance brokerage industry. Alliant has engaged in similar conduct in the past and, unless stopped, will repeat this conduct in the future.

69. Defendants' actions were performed knowingly, willfully, intentionally and/or maliciously, and constitute unfair and deceptive acts, practices and unfair methods of competition in violation of S.C. Code Ann. § 39-5-10 to -160.

70. Accordingly, pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs bring this action to recover actual damages.

71. Furthermore, as provided in S.C. Code Ann. § 39-5-140(a), Plaintiffs seek an award of three times actual damages, reasonable attorney's fees and costs, and any other relief this Court deems necessary and proper.

**FIFTH CAUSE OF ACTION**
**(Breach of Duty of Loyalty)**
**(Against Lonneman)**

72. Plaintiffs re-allege the allegations paragraphs 1 through 71 above as if they are fully set forth herein.

73. Lonneman owed a duty of undivided and unqualified trust, confidence, and loyalty to Plaintiffs by virtue of his employment with Plaintiffs.

74. Lonneman breached his duties to Plaintiffs during his employment, by, among other things, stealing Plaintiffs' Confidential Information for his and Alliant's benefit, directly and

indirectly soliciting Plaintiffs' employees to terminate their employment with Plaintiffs and commence employment with Alliant, identifying to Alliant Plaintiffs' key employees for purposes of recruiting them to Alliant, and, as discussed in Jon Taylor's Declaration, while still employed with Plaintiffs, likely notifying Plaintiffs' largest clients of his impending departure and soliciting Plaintiffs' clients on Alliant's behalf in an effort to assure that Plaintiffs' clients would move with Lonneman to Alliant.

75.     Lonneman did all of the above to prosper in his relationship with Alliant at Plaintiffs' expense.

76.     Lonneman acted maliciously and with willful and wanton disregard for Plaintiffs' rights and property.

77.     By reason of the foregoing, Lonneman is liable to Plaintiffs for actual, compensatory and punitive damages in an amount to be determined at trial.

78.     Plaintiffs also seeks all compensation paid to Lonneman by Plaintiffs during the period of time he was disloyal to Plaintiffs.

## V. **PRAYER FOR RELIEF**

79.     **WHEREFORE**, Plaintiffs respectfully requests that the Court:

(a)     Grant injunctive relief enjoining Defendants from directly or indirectly retaining, using, disclosing, and misappropriating Plaintiffs' confidential and trade secret information;

(b)     Because it is acting in active concert and participation with the Individual Defendants, grant injunctive relief enjoining Alliant from directly or indirectly using or disclosing Plaintiffs' confidential and trade secret information that the Individual Defendants have shared with Alliant or transferred to Alliant devices or systems;

(c) Grant injunctive relief preventing the Individual Defendants from further direct or indirect violations of the RCAs and prohibiting Alliant from further inducing the Individual Defendants to violate their RCAs;

(d) Because it is acting in active concert and participation with the Individual Defendants, grant injunctive relief enjoining Alliant from directly or indirectly tortiously interfering with the Individual Defendants' compliance with the RCA;

(e) Because all Defendants are working in active concert or participation with one another, grant injunctive relief enjoining the Defendants from tortiously interfering with Plaintiffs' business and contractual relationships;

(f) Enter an order extending the restrictions in the RCA based on the period of the Individual Defendants' violations;

(g) Order the Individual Defendants to immediately deliver to Plaintiffs' counsel all originals and copies of Plaintiffs' electronic and hard copy files, documents, information and other property in their possession, custody or control;

(h) Grant Plaintiffs judgment against Defendants for actual, compensatory, and incidental damages in amounts to be determined at trial, together with pre-judgment interest;

(i) Award liquidated, punitive, double, treble, special and/or exemplary damages in amounts sufficient to punish Defendants for their conduct and to deter Defendants in the future from engaging in such intentional, willful and wanton conduct, such as Defendants have displayed toward Plaintiffs in this case;

(j) Grant Plaintiffs judgment against Defendants for all costs, attorneys' fees and other litigation expenses; and

(k)  Grant Plaintiffs such other and further relief as the Court deems just, equitable and proper.

Dated this 22nd day of September, 2023.

Respectfully submitted,

FORDHARRISON LLP

s/*Jeffrey A. Lehrer*
Jeffrey A. Lehrer
jlehrer@fordharrison.com
Federal I.D. No. 7677
Thomas H. Keim
tkeim@fordharrison.com
Federal I.D. No. 3937
Kristin S. Gray
Federal I.D. No. 10181
kgray@fordharrison.com
FORDHARRISON LLP
100 Dunbar Street, Suite 300
Spartanburg, South Carolina 29306
Telephone: (864) 699-1100
Facsimile: (864) 699-1101

***Attorneys for Plaintiffs***

## VERIFICATION

STATE OF SOUTH CAROLINA    :
                           :
COUNTY OF COUMBIA          :

Jon Taylor, being first duly sworn, makes an oath that he is President of AssuredPartners of South Carolina, LLC, and that he has read the allegations in this Verified Complaint, knows the content thereof, and that the statements in the Complaint are true, based upon his own knowledge, information and belief.

_____
Jon Taylor

WSACTIVELLP:112717999.1